**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 12-4724**

───────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

ERIC ANDRE FIELDS,

              Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  James C. Fox, Senior District Judge.  (7:11-cr-00125-F-4)

───────────

Argued:  March 18, 2014           Decided:  May 15, 2014

───────────

Before GREGORY, WYNN, and THACKER, Circuit Judges.

───────────

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Gregory and Judge Thacker joined.

───────────

**ARGUED**:  Mary Jude Darrow, Raleigh, North Carolina, for Appellant.  Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Defendant Eric Andre Fields appeals his convictions and sentence for drug-related offenses, raising several different issues. For the reasons that follow, we affirm.

I.

"Taken in the light most favorable to the Government, the evidence adduced at [Defendant's] trial established the following facts." United States v. Burgos, 94 F.3d 849, 854 (4th Cir. 1996) (en banc) (citation omitted). In 2011, Defendant, who had been living in Texas, returned to Eastern North Carolina, where his family lived. Defendant worked occasionally for his brother doing car repairs. Defendant had previously worked on the sale of a used car to Hartley Bailey. In Summer 2011, Defendant, then forty years old, worked on a second car sale to Bailey. The second car was delivered to Bailey in July 2011.

At trial, Defendant's brother testified that while at the car shop with Defendant on the night of August 22, 2011, "Eric got a phone call that [Bailey] wanted Eric to come pick him up . . . . Eric left to go get him and never came back . . . ." J.A. 303. Though Defendant's brother testified that Defendant went over to Bailey's house on the night of August 22, 2011 to finalize paperwork for the car sale, Defendant's brother

2

admitted on cross-examination that he was not listening to the call Bailey placed to Defendant and "d[id]n't know exactly what was discussed . . . ." J.A. 308. Defendant's brother also testified that he did not know how or for how long Defendant had known Bailey.

Also in Summer 2011, state and federal agents were investigating a drug organization in Brunswick County, North Carolina. They used a confidential informant to purchase cocaine from Jerry Hall ("Jerry"), who in turn named Eddie Hall ("Eddie") as his drug supplier. Further investigation led to Tracey Ballard, also known as "Dog."

Ballard, who began selling drugs for Bailey in 1995, testified that he had met and talked with Defendant before, in a junk yard in Delco, North Carolina. Ballard testified that Defendant "was stating like there was no cocaine around or no marijuana around right there at that point." J.A. 137. Ballard and Defendant were "mostly talking about how there was no marijuana around or cocaine around and, you know, Hartley Bailey – the subject of him came up . . . ." J.A. 136.

In August 2011, Ballard allowed law enforcement to search his residence. There, they found, among other things, a clear, textured, plastic bag containing cocaine. The textured plastic bag featured a diamond-like striation pattern and was a type

"common[ly] [used] as food saver bags . . . to vacuum seal" items.  J.A. 77.

Ballard informed the agents that he had recently picked up approximately three kilograms of cocaine from Bailey's house. Ballard had concealed the cocaine in his pants with his shirt over it "so it won't be able to be noticed when I'm leaving [Bailey's] house."  J.A. 133.  Ballard so concealed the cocaine "[b]ecause [Bailey] informed me how to do it before."  J.A. 133. Of the three kilograms he obtained from Bailey, Ballard was to sell one kilogram and deliver the remaining two kilograms to "a young guy from the neighborhood" named Emanuel Lewis.  J.A. 127. However, Ballard could not locate Lewis.  Ballard therefore returned the two kilograms of cocaine, vacuum-sealed and wrapped in black paper, to Bailey.

The information law enforcement gained from Ballard substantiated reports of "a large amount of narcotics stored in the garage area" of Bailey's house.  J.A. 81.  On that basis, the agents obtained a warrant to search Bailey's house and organized a SWAT team to execute the search.  While waiting for the SWAT team, officers watching Bailey's house saw Bailey and his son arrive by car shortly after 9:00 p.m.  The two appeared to enter the house.  The officers noticed the interior garage light turn on and off several times.

4

Approximately twenty minutes later, i.e., between 9:00 p.m. and 10:00 p.m., Defendant arrived, parked in Bailey's driveway, and walked toward the front door. By this time, the SWAT team had also arrived and began closing in on the area. As the team neared the house, Defendant exited the front door area and headed toward his car. Defendant then appeared to notice the approaching SWAT team: His eyes widened and he froze momentarily. Defendant turned and quickly walked around the corner of the house, despite SWAT team commands. As he did so, Defendant's hands moved toward his waist "as if he was retrieving an object." J.A. 155. Defendant's hands then went "up in a throwing motion" and law enforcement "saw a black object leave his hands and go over a privacy fence on that side of the house." J.A. 154. Defendant then turned back toward the SWAT team, which ordered him to "get on the ground." J.A. 194. Defendant complied.

Inside the fence, officers found two rectangular, flattened packages "wrapped in a black-like tissue paper tape . . . ." J.A. 229. The packages appeared to be the same type of food saver bags found at Ballard's residence. One package contained 980.1 grams of cocaine and the second contained 642.8 grams of cocaine.

Searching Bailey's house, the officers found a vacuum-sealing appliance commonly "used to conceal and mask the odor of

5

narcotics from K-9's and other detection devices[,]" J.A. 232, and food saver bags identical to the ones seized from Ballard's residence and from inside the fence. The officers found several cell phones, a hand gun, and ammunition. And they found "a ledger describing the sale of narcotics." J.A. 238. First among the names on the ledger was "Dog," listed next to "$2,750." J.A. 88. Defendant's name did not appear on the ledger.

However, law enforcement found several documents belonging to Defendant in different parts of Bailey's home. Specifically, the officers found a blank personal check of Defendant's in the master bathroom and a receipt acknowledging revocation of Defendant's commercial driver's license in the garage area. They also found two uncashed payroll checks (one issued April 15, 2011 for $387.53, the second issued April 22, 2011 for $573.11), and a Direct TV bill in a bag in the garage area.

Defendant was arrested and rode in a prisoner transport van with Ballard, Jerry, and Eddie. Defendant cautioned Ballard to "keep it hushed . . . because there could be cameras and stuff like that around" in the van. J.A. 134. According to Ballard, Defendant stated that "when the police came up over there at Hartley Bailey's house he was over there and he was going to tell them that, you know, he pretty much was over there to sell a car to Hartley Bailey." J.A. 134-35.

6

Defendant, Jerry Hall, Eddie Hall, and Tracey Ballard were charged with multiple drug offenses in a ten-count indictment. Count One charged all defendants with conspiring to possess with the intent to distribute and distribute twenty-eight grams or more of cocaine base (crack) and five hundred or more grams of cocaine. Count Ten charged Defendant with possessing with the intent to distribute five hundred grams or more of cocaine. Defendant proceeded to trial on these charges on February 1, 2012. The jury was unable to reach a verdict, however, and the district court declared a mistrial.

Defendant was re-tried in March 2012. Defendant moved for a judgment of acquittal at the close of the government's case and at the close of all evidence; the district court denied the motions. During closing arguments, the government three times mentioned that Emanuel Lewis was Defendant's cousin, although this fact was not in evidence. Defendant did not object to these statements but instead contended that "[t]he fact that my client is related to somebody" was not "a reason to find him guilty of something[.]" J.A. 339.

The jury found Defendant guilty on both the conspiracy count and the possession count. The district court sentenced Defendant to concurrent sentences of 72 months' imprisonment, and Defendant appealed.

II.

A.

Defendant argues that there is insufficient evidence to support his convictions. We review this issue de novo. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005).

The standard for reversing a jury verdict of guilty is a high one: The Court does so only "where the prosecution's failure is clear." United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007) (quotation marks omitted). That is because "the appellate function is not to determine whether the reviewing court is convinced of guilt beyond reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, 'whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.'" Burgos, 94 F.3d at 863 (quoting United States v. Powell, 469 U.S. 57, 67 (1984)). The "jury's verdict *must be upheld* on appeal if there is substantial evidence in the record to support it," where substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010) (quotation marks and citations omitted).

Further, "[w]hile any single piece of evidence, standing alone, might have been insufficient to establish [the defendant's] participation in the . . . drug conspiracy," the Court must uphold a conviction where "a rational jury could infer from the totality of the evidence that a conspiracy existed." Burgos, 94 F.3d at 863 (quotation marks omitted). The focus of our review, therefore, "is on the complete picture, viewed in context and in the light most favorable to the Government, that all of the evidence portrayed." Id.

1.

Defendant contends that there is insufficient evidence to sustain the jury's verdict finding him guilty of possession with the intent to distribute 500 grams or more of cocaine. To prove possession with the intent to distribute cocaine, the government was required to show beyond a reasonable doubt that Defendant knowingly possessed cocaine with an intent to distribute it. See 21 U.S.C. § 841(a)(1); United States v. Penniegraft, 641 F.3d 566, 572 (4th Cir. 2011).

Possession of a drug may be actual or constructive. Penniegraft, 641 F.3d at 572. "The government may prove constructive possession by demonstrating that a defendant exercised, or had the power to exercise dominion and control over an item." Id. Further, the quantity of drugs within a defendant's possession may indicate intent to distribute.

9

Young, 609 F.3d at 355 (citing United States v. Rusher, 966 F.2d 868, 878 (4th Cir. 1992) ("Intent to distribute may be inferred from the quantity of drugs possessed.")).

Here, there is substantial evidence to uphold Defendant's conviction of possession with the intent to distribute cocaine. Several witnesses testified that when Defendant left the front door area of Bailey's home and appeared to spot the approaching SWAT team, he threw a "black object" over the fence of Bailey's house. J.A. 154. Officers then retrieved two packages "wrapped in the black covering" from behind the fence. J.A. 157. Together, the two packages contained approximately 1.6 kilograms of cocaine. And a government witness testified that a kilogram of cocaine yields approximately 5,000 individual dosages in powder form and 10,000 dosages of crack cocaine. In the light most favorable to the government, this evidence was sufficient to show that Defendant knowingly possessed 500 grams or more of cocaine that he intended to distribute. We therefore affirm his possession conviction.

2.

Defendant also challenges his conviction for conspiracy to distribute cocaine. To prove this crime, the government must establish that: (1) an agreement to possess cocaine with intent to distribute the substance existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant

10

knowingly and voluntarily became part of the conspiracy. Burgos, 94 F.3d at 857.

Because a conspiracy is by its nature "clandestine and covert," the existence of a conspiracy, as well as a defendant's participation in the conspiracy, are generally proved by circumstantial evidence. Id. at 857. "Once a conspiracy has been proved, the evidence need only establish a slight connection between any given defendant and the conspiracy to support conviction." United States v. Strickland, 245 F.3d 368, 385 (4th Cir. 2001). See also Burgos, 94 F.3d at 862. Further, a defendant may participate in a conspiracy "without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." United States v. Allen, 716 F.3d 98, 103 (4th Cir.) (quotation marks omitted), cert. denied, 133 S. Ct. 2819 (2013).

In our recent United States v. Gomez-Jimenez decision, we held that the following was enough to sustain convictions for drug conspiracy and aiding and abetting: (1) evidence that a particular trailer was a drug stash house; (2) evidence that the defendant drove to the trailer after two cocaine sales and away from the trailer to a third sale; (3) evidence that the defendant stayed at the trailer overnight; and (4) evidence that the defendant's son lived in the trailer. __ F.3d __, 2014 WL 1623072, at *6 (4th Cir. 2014).

11

Similarly, in Young, we deemed the following sufficient to support a drug conspiracy conviction: (1) the defendant's possession of a large quantity of cocaine; (2) the defendant's possession of a large amount of cash; (3) the defendant's possession of multiple cell phones, including one he used exclusively for calling a co-conspirator; and (4) expert testimony that drug dealers frequently use different cell phones to make and receive calls from suppliers, customers, and family. 609 F.3d at 355.

And in United States v. Pupo, we held that the following was sufficient to support a drug conspiracy conviction: (1) the defendant had carried a tote bag with cocaine in it; (2) the defendant stayed in a hotel with a co-conspirator until the co-conspirator spoke to another co-conspirator and reported that a transaction was complete—though nothing in our analysis in Pupo suggests that the defendant knew about the call or its contents; and (3) the defendant was reportedly "going crazy." 841 F.2d 1235, 1238 (4th Cir. 1988) (en banc).[1]

---

[1] While additional facts that could have bolstered the Court's analysis were mentioned in the opinion, our analysis of the sufficiency of the evidence on the conspiracy count expressly listed a smaller subset of facts that the "jury could properly conclude . . . were more consistent with participation than they were with mere acquiescence" and from which the jury could conclude that the defendant "was a participant in the conspiracy." Pupo, 841 F.2d at 1238.

Here, as in those cases, we cannot conclude that "the prosecution's failure is clear." Foster, 507 F.3d at 245 (quotation marks omitted). Without question, the government presented substantial evidence that a conspiracy existed. Numerous government witnesses, including Ballard, testified about the drug distribution ring that started with Bailey and extended to others including the Halls. Consequently, all that the government had to establish was a "slight connection" between Defendant and the conspiracy. Burgos, 94 F.3d at 861. This, the government did.

Specifically, looking, as we must, at "the complete picture, viewed in context and in the light most favorable to the Government, that all of the evidence portrayed[,]" Burgos, 94 F.3d at 863, the evidence shows that Defendant noted to Ballard, who had sold drugs for Bailey since 1995, a lack of marijuana and cocaine, and the subject of Bailey came up. On the night of Defendant's arrest, Bailey called Defendant and asked Defendant to come over to his house. As requested, Defendant went to Bailey's house. At the house, there were not only drug conspiracy items such as packaging paraphernalia, a sale log, several cell phones, and a gun—but also personal items of Defendant's, such as a blank check, uncashed paychecks, and a bill, found in different parts of the house. Law enforcement caught Defendant leaving the front door area of Bailey's house

13

with approximately 1.6 kilograms of cocaine tucked in his pants waist—the same place Ballard testified Bailey had instructed Ballard to conceal drugs when exiting the house. (To the extent that Defendant's insufficiency argument regarding the conspiracy charge relies on the government's failure to prove possession of the cocaine, that argument must fail because we have already upheld the possession conviction.) And the cocaine that Defendant possessed was uniquely packaged like the cocaine Ballard had just returned to Bailey. This evidence, taken together and in the light most favorable to the government, is sufficient to sustain the jury's verdict. Accordingly, we affirm Defendant's conspiracy conviction.

## B.

With his next argument, Defendant contends the prosecutor committed misconduct by arguing a fact not in evidence during closing arguments: The prosecutor told the jury three times in closing argument that Emanuel Lewis, the person to whom Ballard attempted to distribute approximately two kilograms of cocaine for Bailey, was Defendant's cousin.

Specifically, the government argued that "[Ballard] indicated that he had to take two kilos back to a guy named Emanuel Lewis who is the Defendant Eric Fields' cousin." J.A. 324. Later, the government stated that, "I would submit to you in this particular case, Emanuel Lewis wasn't there when Tracey

14

Ballard went to go drop off the cocaine and his cousin came to pick it up." J.A. 350. And finally, the government, in arguing that there was an existing relationship between parties in the case, again stated that "Emanuel Lewis is the Defendant's cousin." J.A. 353.

Defendant did not object on this basis at trial. To the contrary, Defendant offered counter-argument on the matter: "The fact that my client is related to somebody[,] is that a reason to find him guilty of something? No, that's not the only reason to find him guilty of something." J.A. 339. Accordingly, we review this issue only for plain error. Alerre, 430 F.3d at 689. "In reviewing for plain error, we must affirm unless an appellant can show that (1) an error was made, (2) it was plain, and (3) it affected the appellant's substantial rights. Moreover, the correction of plain error lies within our discretion, which we do not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (citation and quotation marks omitted).

In this case, the government concedes that the remarks at issue were improper. See United States v. Wilson, 135 F.3d 291, 298 (4th Cir. 1998) ("By going outside the evidence, the prosecutor violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." (quotation

15

marks omitted)). However, "[v]iewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16 (1985).

In determining whether a "defendant's substantial rights were prejudiced to the point of denying him a fair trial," we have considered various factors in the context of the entire trial: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by defense counsel; and (6) whether curative instructions were given to the jury. Wilson, 135 F.3d at 299.

Looking to those factors here, we cannot conclude that the government's misconduct deprived Defendant of a fair trial. First and foremost, that Defendant and Lewis were cousins was largely irrelevant to the government's case against Defendant for possession of cocaine with intent to distribute. As held above, the government presented substantial evidence to show that Defendant possessed cocaine with the intent to distribute

16

it. Further, while Defendant contends that "[t]here was a paucity of evidence placing the defendant into the conspiracy" and thus "[b]y arguing that the defendant and Emanuel Lewis were related, the government provided the jury with the proverbial 'missing link[,]'" Appellant's Br. at 11, we have already held that the government proffered substantial evidence of Defendant's connection to Bailey such that his conspiracy conviction must be sustained. For purposes of the conspiracy case, too, then, that Defendant and Lewis were cousins was largely a sideshow.

Defendant points to the likely cause of the misstatements: "Since this was a re-trial after a hung jury, the erroneous statements of the prosecutor may have come from the earlier testimony, or may have been information gleaned through the investigation, or trial preparation." Appellant's Br. at 9-10. Thus even Defendant does not suggest, nor does anything else, that the comments were deliberately placed before the jury for nefarious purposes. Indeed, defense counsel himself appears to have lost sight of the fact that Lewis's and Defendant's relationship had not been introduced into evidence, since defense counsel himself brought the issue up to the jury, stating that "[t]he fact that my client is related to somebody[,] is that a reason to find him guilty of something?

17

No, that's not the only reason to find him guilty of something." J.A. 339.

Given that defense counsel not only failed to object to, but even himself mentioned, Lewis's and Defendant's relationship, it is not surprising that the district court failed to give a curative instruction specifically geared to the misstatements. But the district court did instruct the jury, just prior to closing arguments, that "[y]ou will recall at the outset I instructed you that what the lawyers had to say in the case was not evidence. You should not consider what they have to say as evidence and that instruction is still valid." J.A. 319.

In sum, we cannot conclude that the prosecutor's misstatements "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." Young, 470 U.S. at 16. We therefore will not upend Defendant's convictions on that basis.

C.

Finally, Defendant argues that the district court committed procedural error in failing to specifically address the pertinent 18 U.S.C. § 3553(a) factors during sentencing. We review the sentence for reasonableness, applying an abuse of discretion standard. United States v. Diosdado-Star, 630 F.3d 359, 363 (4th Cir. 2011).

18

When sentencing, a district court should first correctly calculate the applicable United States Sentencing Guidelines range and thereafter give the parties the opportunity to argue for whatever sentence they deem appropriate. United States v. Hernandez, 603 F.3d 267, 270-71 (4th Cir. 2010). The sentencing court must then conduct an individualized assessment of the facts before it, select a sentence, and explain the chosen sentence. Id. But when a sentencing court decides to simply apply the Sentencing Guidelines, "doing so will not necessarily require lengthy explanation." Rita v. United States, 551 U.S. 338, 356 (2007). And a district court generally need not "robotically tick through § 3553(a)'s every subsection." United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006).

Here, Defendant's Sentencing Guidelines range was 63 to 78 months. J.A. 372. The district court heard argument from both sides on the Section 3553(a) factors and commented on each side's presentation. For example, the court noted that it was "very impressed with [Defendant's] naval service and his getting his welding certificate," J.A. 375, but observed that Defendant "let himself down and he let [his family] down too." J.A. 376. In response to the government's argument that "the court needs to temper [Defendant's accomplishments] with the harm he's done to our community[,]" the district court stated, "Well, I tend to agree with you. . . . I've said this a million times and I'll

19

say it to Mr. Fields, if you're going to stop using drugs you've got to change your friends because they'll talk you back into using them if you keep friends that are using drugs." J.A. 378. The district court stated that it had considered the Section 3553(a) factors and imposed a within Guidelines 72-month sentence.

In sum, the record shows that the district court considered the pertinent Section 3553(a) factors, made an individualized sentencing determination, and explained, even if relatively briefly, that determination. We therefore affirm Defendant's sentence.

## III.

For the foregoing reasons, Defendant's convictions and sentence are

AFFIRMED.